## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SHEILA OFFICER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 04-2418-KHV |
| SEDGWICK COUNTY, KANSAS, | ) | |
| and SEDGWICK COUNTY DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Sheila Officer filed suit against Sedgwick County, Kansas, her former employer, for race

discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000 et seq., and the Kansas Acts

Against Discrimination, K.S.A. § 44-1009 et seq. ("KAAD").[1] This matter comes before the Court

on Sedgwick County's Motion For Summary Judgment (Doc. #51) filed July 5, 2005. For reasons

set forth below, the Court sustains defendant's motion.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c);

accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d

---

[1] Plaintiff filed suit against Sedgwick County and the Sedgwick County Department of Corrections, alleging nine federal and state law claims. On March 14, 2005, the Court dismissed the Sedgwick County Department of Corrections. It also dismissed all claims against Sedgwick County except for race discrimination (Count I) and retaliation (Count III). See Order (Doc. #39) filed March 14, 2005.

1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on its pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment."  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

**Factual Background**

2

For purposes of defendant's motion for summary judgment, the following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff.

In October of 1991, Sheila Officer, an African-American, began working in the Sedgwick County Corrections Department ("Corrections Department") as an Intensive Supervision Officer I ("ISO I"). Plaintiff was responsible for supervising adult felons on probation. Plaintiff reported to Annie Nash, an ISO III in the Adult Field Services Division. Nash reported to Kerri Platt, who has been administrator of the Adult Field Services Division since August 1, 1994. Platt administers the adult intensive supervision program and the pretrial services program. Platt reports to Mark Masterson, who has directed the Corrections Department since August of 1997.

The Corrections Department employs 324 persons in six divisions to provide adult and juvenile corrections services. The progressive discipline policy allows the decision-maker discretion to impose discipline ranging from verbal counseling through written reprimand, probation, suspension without pay, demotion and termination. Masterson is the Corrections Department decision-maker for the most serious levels of employee discipline, including demotion and termination. He has delegated to lower-level supervisors the authority to issue written reprimands and less severe discipline. The Corrections Department conducts interim employee performance reviews every six months and regular performances reviews every 18 months.

On November 30, 1998, Nash prepared and discussed with plaintiff a written evaluation of plaintiff's job performance. Nash wrote the following regarding plaintiff's job performance:

> Sheila is a self-starter who appears committed to helping her clients. She utilizes community resources to assist her clients in meeting the conditions of probation. In her zealous efforts to assists her clients, she frequently fails to integrate program's policies and procedures into her decision making.

3

<u>Memorandum In Support of Defendant's Motion For Summary Judgment</u> (Doc. #52) Ex. 8 at 3.[2]

On March 11, 1999, Nash issued plaintiff a memo which identified deficiencies in plaintiff's work. Two months later, on May 11, 1999, Nash issued plaintiff a Warn and Counsel memo about plaintiff's frequent failure to work eight hours and to work the schedule approved by her supervisor. On May 26, 1999, Nash discussed with plaintiff a written evaluation of plaintiff's job performance which stated as follows:

> Sheila's focus continues to be very client centered. She needs to accept the responsibility she has for fulfilling the program responsibility to the court and the community as well as to her clients. She is demonstrating improvement in preparing correspondences in advance of court hearings. She is conducting more field visits. She needs to continue to work to demonstrate improvement in meeting KDOC Standards during the Intake Level of supervision. More face-to-face contacts, especially field visits, are needed.

<u>Id.</u> Ex. 11 at 2.[3]

In October of 1999, Nash discussed with plaintiff her written evaluation of plaintiff's job performance. That evaluation stated in part as follows:

> Sheila utilizes community resources to assist her clients in meeting the conditions of probation. She uses creative sanctions when addressing some of her client probation

---

[2]        Plaintiff attempts to controvert this comment by pointing to her own comments at the end of the evaluation: "This employee contend[s] that this statement is vague, broad and unverifiable. This statement reflects on characteristics of her individuality, not performance and job knowledge. As the outcome of her performance and job knowledge has not rendered negative results, but has accomplished the goals and mission of the department." <u>Defendant's Memorandum In Support</u> (Doc. #52) Ex. 8 at 5. This employee comment does not controvert evidence that Nash wrote the comment set forth above in plaintiff's evaluation.

[3]        Plaintiff does not controvert the contents of her performance reviews for May and October of 1999, but states "controverted in so far as it is implied that this was any reason for termination, because in the Employee Performance Review done in May and October, 1999, [plaintiff] received satisfactory reviews." <u>Plaintiff's Response To Defendant's Motion For Summary Judgment</u> (Doc. #63) at 2.

> violations. In her desire to help her clients, she sometimes loses focus of the bigger picture. She has difficulty detaching from her clients which leads to occasional deviation from the program's policy and procedures. File audits reveal that contact standards are frequently not met during the Intake Level. During this performance review, Sheila has an overall average of 96% in completing Performance Objectives per policy and 98% of clients employed.

See id. Ex. 12 at 4. Plaintiff received a raise based on the performance review of October, 1999, which rated her as fully meeting or meeting most of her job expectations.

On January 27, 2000, Nash wrote plaintiff a memo which identified deficiencies in her documentation and supervision of probationers. On February 22, 2000, Nash issued plaintiff a Memorandum of Concern regarding inadequate job performance. On May 19, 2000, Nash issued plaintiff a Warn and Counsel memo regarding failure to follow department procedure for urine tests of probationers. In late May of 2000, Nash discussed with plaintiff her written evaluation which stated as follows:

> Sheila is client focused. She has difficulty organizing her thoughts and ideas into a concise written report but is completing probation letters prior to court hearings. She utilizes community resources to assist her clients. She is willing to follow policies that are in agreement with her values and opinions. File audits reveal that contact standards are usually not met especially during the Intake Level. Sheila frequently does not provide follow-up documentation. Supervision plans are frequently late. She is experiencing difficulty entering information in TOADS according to the Chronological Record Policy.[4] She is also experiencing difficulty in entering and keeping updated clients' obligations, employment and interventions in TOADS. She does not keep her Policy and Procedures Manual updated. Thus, Sheila is sometimes unaware of policy changes which impact how she performs her job duties.

Defendant's Memo In Support (Doc. #52) Ex. 16 at 3. In November of 2001, Nash completed and discussed with plaintiff the following evaluation:

---

[4]     TOADS is the acronym for the computer system which Corrections Department employees use to contemporaneously document all supervision-related activities for each probationer.

5

> Overall, Sheila has done a good job in meeting KDOC Contact Standards this review period. Sheila has maintained good face-to-face contacts with her clients. Supervision plans and Risk/Needs are usually completed in a timely manner. Sheila sometimes fails to appropriately address clients' lack of following through with their conditions of probation. She has failed to inform judges of client violations in a timely manner (judges' notebook is available regarding their expectations). Sheila sometimes makes recommendations to the court which do not reflect the seriousness of the client's violations. Additionally, Sheila does not schedule specific times for her clients to report. Thus, she is sometimes unavailable when her clients report.

Id. Ex. 17 at 3. The evaluation also stated that "Sheila is knowledgeable of TOADS" and that she "has been accepting of constructive criticism from her supervisors." Id.

On March 12, 2002, Nash wrote plaintiff a memorandum about the need to improve her overall job performance, as follows:

> You are expected to review each journal entry in order to know court ordered conditions of your clients. All court ordered conditions are expected to be followed. Use the judges' survey to aid in knowing judges' expectations. You are to fully disclose client violations to the judge. File audits have shown occasions in which only partial disclosure has occurred.

Id. Ex. 18 at 2.

On May 20, 2002, the County Sheriff's Department reported to Masterson that while plaintiff was off duty on May 19, 2002, plaintiff went to her son's house after two white sheriff's officers had arrived to investigate a burglary. The deputies reported that plaintiff had repeatedly yelled at them and tried to grab paperwork from one deputy's hand. Plaintiff denied these allegations. Plaintiff testified that white officers arrested her son but later released him and that no charges were filed. Plaintiff stated that there was "bad blood" between her and one of the officers, and that in his report he lied about her behavior.

On May 22, 2002, Nash issued plaintiff a memo regarding her failure to enter urine test results into TOADS on a consistent basis.

6

On June 4, 2002, Nash discussed with plaintiff the following evaluation:

Sheila has performed her job well in meeting KDOC's face-to face contact standards. She stays abreast of available community resources. She is, however, slow to integrate change into existing procedures. Additionally, file audits and monthly stats have revealed areas in which Sheila needs to focus on in order to improve her overall job performance. Specifically, Sheila should ensure consistency in: entering and updating information in TOADS (incorrect contact types and UA information are frequently entered in TOADS; there are sometimes no follow-up documentation regarding client related activities; interventions contacts are sometimes not conducted per policy; status changes are frequently not updated in TOADS, etc.); she needs to disclose detailed information to judges regarding client probation violations.

Id. Ex. 20 at 3.[5]

On June 25, 2002, Platt issued plaintiff a Warn and Counsel memo regarding the incident on May 19, 2002. Platt warned plaintiff to avoid any conduct that could be construed as "an obstruction of justice or bring discredit to the department." See Defendant's Memo In Support, Ex. 23.

On July 22, 2002, Judge David Kennedy contacted Nash to express concern about plaintiff's supervision of an adult felon. Nash sent Greg Friedman, an ISO II, to speak to the judge. Judge Kennedy told Friedman that he thought plaintiff was running interference or protecting clients from him.[6] Judge Kennedy told Friedman about a case in which plaintiff did not provide information that

---

[5]     Plaintiff attempts to controvert Nash's evaluation, relying upon her own deposition statement that she was receptive to constructive feedback, was committed to working with clients and was no slower than everyone in integrating change; that everyone had trouble learning TOADS; and that TOADS was down "half the time." See Officer Depo., Vol. I, at 146-151. She also testified that she was active in the community and shared information with her colleagues. See id. Plaintiff's evidence may support her contention that Nash's evaluation was inaccurate, but it does not controvert defendant's evidence that Nash wrote the comments set forth in plaintiff's evaluation of June 4, 2002.

[6]     Plaintiff attempts to controvert this fact with her own deposition testimony that she was not running interference or protecting clients, and that she did not know that Judge Kennedy had any complaints about her work. See Officer Depo. at 122. Plaintiff, however, does not controvert
(continued...)

Judge Kennedy thought was important in making his decision.  Judge Kennedy also said that he

believed that plaintiff was avoiding face-to-face contact with him by sending him e-mails even after

he told her that e-mail was no longer acceptable.  Judge Kennedy asked the Corrections Department

to review any cases that plaintiff was supervising for him.[7]

<u>The Ronda Felix Case</u>

In February of 2001, Judge Karl Friedel placed Ronda Felix, an adult felon, on probation.

In three separate cases, Felix had been convicted of multiple counts of giving worthless checks and

theft.  As conditions of probation, Judge Friedel ordered Felix to: (1) obey all laws, (2) pay restitution

and court costs, (3) maintain full-time employment except during in-patient treatment or while

attending school full-time, (4) submit to a psychological evaluation if a prior evaluation was not

available and (5) participate regularly in mental health counseling.  Plaintiff supervised Felix's

probation.

In March of 2001, the Sedgwick County Court transferred Felix's supervision to Shawnee

County, Kansas.  Cinda Hahn supervised Felix in Shawnee County.  In November of 2001, Felix

violated the conditions of her probation and Judge Friedel issued a warrant for her arrest.  On

February 26, 2002, Judge Friedel revoked Felix's probation but immediately reinstated it subject to

the conditions previously imposed, as well as the additional conditions that she reside and work in

Sedgwick County.  Plaintiff was present at the revocation hearing and was assigned to supervise

---

[6](...continued)
the fact that Judge Kennedy had such concerns and discussed them with Friedman.

[7]    Plaintiff attempts to controvert this fact with her own deposition testimony that she
was not avoiding face-to-face contact with Judge Kennedy, and that she did not send him e-mails.
Plaintiff, however, does not controvert the fact that Judge Kennedy held such beliefs.

Felix's reinstated probation.  Felix appeared to be pregnant at the revocation hearing, but she was not.  In fact, because of a prior hysterectomy, Felix could not become pregnant.[8]

On April 4, 2002, plaintiff sent an e-mail to Judge Friedel which mentioned Felix's pregnancy and indicated that Felix was complying with her probation conditions.  On June 21, 2002, plaintiff sent Judge Friedel an e-mail which stated that Felix was "two days short of having her baby."  Plaintiff did not mention any probation violations except that Felix had not yet completed all of her community service.

On Friday, July 5, 2002, plaintiff visited Felix at home.  Felix was hysterical and told plaintiff that a nurse at the Salina Regional Medical Center had stolen her baby.  Late that afternoon,  plaintiff informed Nash that someone had stolen Felix's baby.  Nash directed plaintiff to contact the Salina hospital and the Salina Police Department to see whether they had information about Felix's baby.[9]  Plaintiff's TOADS entries for July 5, 2002 indicate that plaintiff called and learned that the hospital and police department had no record of Felix giving birth or of a stolen baby.

---

[8]    Plaintiff attempts to controvert this evidence with the following statement:

Judge Friedel, Felix's lawyer, the plaintiff and Annie Nash, plaintiff's supervisor, thought Felix was pregnant based on her appearance and that Ronda Felix and her husband, Mr. Soto, told them she was pregnant.  Felix's lawyer told Judge Friedel that she was pregnant.  Ronda Felix provided plaintiff with a note from Dr. Messamore for bed rest.  There is no medical evidence to support that a pregnancy was impossible, only that it was unlikely.  That evidence was never available to plaintiff because plaintiff was not given Felix's federal records.

Plaintiff's Memorandum In Opposition (Doc. # 63) at 6, citing Officer's Depo. at 167 -170.  This statement does not controvert the fact that Felix was not pregnant.

[9]    Plaintiff  does not recall Nash telling her to call the Salina agencies or actually calling them.

Nash claims that on July 5, 2002, she instructed plaintiff to contact the Wichita Police Department to see whether they were investigating a stolen baby report. Plaintiff does not recall that Nash told her to call the Wichita police, and her TOADS entries for July 5, 2002 do not show that she called.

On Sunday, July 7, 2002, the Wichita Eagle newspaper ran an article entitled "Suspicious Woman Asked For Location Of Newborn Babies." The article stated that police were investigating reports that a woman had visited hospitals in Wichita and Salina and asked suspicious questions about where newborn babies were kept. The woman, who was dressed in hospital scrubs and a white lab coat, had visited a Wichita hospital at about 10:00 a.m. on July 5, 2002. The article gave a description of the woman. On July 7, 2002, plaintiff saw this newspaper article, as well as a television news report with a hospital photograph of the woman. On Monday, July 8, 2002, plaintiff showed the newspaper to Nash.[10] Nash told plaintiff that she believed Felix was the suspicious woman described in the article. Nash shared her suspicion with Platt and requested Platt's assistance in contacting the Wichita police.

Nash claims that on Monday, July 8, 2002, she instructed plaintiff to call Felix's physician, Dr. Deborah Messamore, for information on when and where the baby was born. Plaintiff testified that Nash took the Felix file from her on July 8, 2002, however, and that Nash did not ask her to call Dr. Messamore until later in the week. A TOADS entry states that plaintiff called Dr. Messamore on July 8, 2002, but plaintiff believes that the call was after July 8, 2002. In any event, plaintiff states that

---

[10]    According to Nash's affidavit, plaintiff said that the article added credibility to Felix's story that her baby had been stolen. Plaintiff denies making that statement and points out that Nash did not mention the alleged statement in her deposition testimony.

after being put on hold, she spoke to someone named Deborah, who plaintiff assumed was Dr. Messamore. Plaintiff says that "Deborah" told her that Felix had miscarried. A few minutes later, however, someone who identified herself as Dr. Messamore called plaintiff and told her that Felix had had a hysterectomy. Plaintiff's TOADS entries for July 8, 2002 indicate that Dr. Messamore told plaintiff that Felix had had a hysterectomy and could not have children. Plaintiff reported these telephone conversations to Nash. Nash says that she again expressed to plaintiff her belief that Felix was the suspicious hospital visitor who was sought by police. According to Nash, plaintiff said that she would have to see Felix in the hospital photograph before she would believe it. Plaintiff testified that when she read the article and saw the television story, "it sounded like it might be (Ronda). But my instinct was telling me, maybe; and then my other mind was saying, I don't think so. So that's why I took the article in." Officer Depo. at 160.

Felix had a regular appointment to meet plaintiff at 5:00 p.m. on July 8, 2002, at the Corrections Department offices. Felix did not show up, so plaintiff called her. Felix gave an excuse for being late. Although Felix said that she would come in then, plaintiff told her to come in first thing the next morning because the office was closing at 6:00 p.m. The next morning, Nash called Dr. Messamore's office and asked to speak to nurse "Deborah" or Dr. Messamore. Nash learned that nurse "Deborah" was not in the office that week and that nurse "Megan" was filling in for her.[11] Nash asked that Dr. Messamore or nurse "Megan" return her call. According to Nash, Dr.

---

[11]    Plaintiff attempts to controvert Nash's testimony by asserting that the nurse's name was "Debra." As defendant points out, the nurse was never deposed and the record contains no conclusive evidence on whether her name was spelled "Debra" or "Deborah."

Messamore called a few minutes later and said that "Megan" had spoken to plaintiff the day before.[12]

According to Nash, Dr. Messamore said that plaintiff had asked whether Felix might have had a

miscarriage and "Megan" had told her that Felix had not had a miscarriage because she had had a

hysterectomy.  Dr. Messamore also told Nash about the second conversation, in which she advised

plaintiff of the hysterectomy.  Dr. Messamore denied that "Megan" could have confused Felix with

another patient or told plaintiff that Felix had a miscarriage.

Felix did not go to the Corrections Office on July 9, 2002 as plaintiff had instructed the

evening before.  Plaintiff called Felix's residence.  When no one answered, she left a message on the

answering machine.  Plaintiff told Nash that Felix had not reported.[13]  Nash then met with Platt and

a Wichita police detective.  Nash reviewed a hospital photograph and identified Felix as the

suspicious woman in blue scrubs.  The detective and Nash then went to Felix's apartment but no one

was home.

The next morning, July 10, 2002, Nash and the detective returned to Felix's apartment.  When

no one answered the door, they asked a maintenance employee to unlock it.  When they entered,

they saw a new bassinet and other baby items.  Later that day, Judge Friedel issued a warrant for

_____

[12]     As set forth above, plaintiff testified that she did not call Dr. Messamore's office on
July 8, 2002.

[13]     Nash testified that on July 9, 2002, she told plaintiff that she had reviewed plaintiff's
TOADS computer entries regarding Felix and observed several red flags.  Nash says she also
expressed to plaintiff her concern about the lack of documentation of any effort to investigate alleged
probation violations by Felix.  Nash also says she told plaintiff that the Felix case once again showed
how plaintiff became too involved with her clients and lost objectivity.  Plaintiff does not recall Nash
making those statements.  According to Nash, plaintiff still did not believe that Felix was the woman
sought by police.  Plaintiff testified that she was unsure.  Plaintiff states that at that time, she may
have told Nash that she liked to give her clients the benefit of the doubt.

Felix's arrest for probation violations.  Within a week, after officials observed her on a surveillance video in an El Paso hospital, Felix was arrested in Texas.  On September 17, 2002, Judge Friedel revoked Felix's probation and ordered her to serve a two-year prison sentence for prior crimes.  Felix also pled guilty to a new charge of impersonating a doctor, a misdemeanor for which Judge Friedel sentenced her to six months in term.

<u>Officer's Termination</u>

On July 10, 2002, Nash completed a written audit of plaintiff's supervision of Felix.  Nash found that plaintiff had not conducted the mandatory initial case file audit and had not correctly determined the level of supervision that Felix needed based on the department's objective risk/needs assessment criteria.[14]  Nash's audit also revealed that plaintiff frequently did not prepare required follow-up documentation regarding Felix's office visits and other issues.[15]  Nash also found that plaintiff did not have a release to obtain information from Dr. Messamore regarding Felix's purported pregnancy.   Nash further found that Felix had completed only three of 20 hours of community service she was obligated to perform.[16]

In the "Supervisor's Comments" section of the audit, Nash wrote that plaintiff should not have asked the Shawnee County ISO to hold off on requesting a probation violation warrant for Felix in the fall of 2001.  Nash noted that plaintiff should have instructed Shawnee County to send Felix

---

[14]     Plaintiff testified that an initial case file audit is the responsibility of ISO II or III, in this case Nash or Platt.  Officer Depo. at 219.

[15]     Again, plaintiff states that she controverts the substantive findings of Nash, but she does not deny that Nash made these findings.

[16]     Judge Friedel had approved a waiver of community service work for Felix because of purported restrictions based on pregnancy.

back to Sedgwick County when that ISO reported to plaintiff that Felix was violating probation.

Regarding plaintiff's supervision of Felix in 2002, Nash found as follows:

> Client reinstated on probation on 2-26-02. Contact standards not met in April, May and June. Employment verified with the Arnold Group and Wescot. You frequently failed to provide follow-up documentation regarding unkept scheduled office visit and client-related activities. Client told you on 5-13-02 that she had a doctor's notification regarding her restriction. There is no document that you ever asked to see information. Yet, you made a decision that client may be excused from doing her community service work. Client told you she was on medical restrictions. You attempted to visit her at her home on 5-14 but she did not answer door. You never confronted client. Actually, client had only one office visit in May and only two office visits in June. This client has a history of not complying with her court-ordered condition. Why did you not confront and request medical documentation from the doctor?

Defendant's Memorandum In Support (Doc. #52) Ex. 37 at 4. Nash's audit also listed other deficiencies in plaintiff's TOADS entries on Felix. On July 19, 2002, Platt and Nash spoke to plaintiff. Platt asked plaintiff why she had allowed Felix to stop community service work and miss work and office visits without attempting to verify that Felix was pregnant. Plaintiff responded that she did not think it was necessary because at a hearing on February 26, 2002, Judge Friedel said that Felix did not have to work for a certain number of weeks before and after the baby was born. Plaintiff might have said this because she did not think it was necessary to obtain verification of Felix's pregnancy from Dr. Messamore. Platt asked plaintiff why she had not followed up on reports of possible crimes by Felix in 2001, when Felix was in Shawnee County. According to Platt, plaintiff said she just forgot about them and started fresh when Felix returned to Wichita.[17]

On August 13, 2002, Platt notified plaintiff of a pre-termination hearing to be held on August 20, 2002. Platt recommended termination of plaintiff's employment for violation of

---

[17]    Plaintiff does not recall saying that to Platt.

Department policies with respect to Felix's supervision, as well as general inadequate job

performance. Platt's memo invited plaintiff to present oral and/or written responses at the hearing

as to why she should not be terminated. The memo set out plaintiff's policy violations regarding

Felix in chronological order. The first policy violation which Platt alleged was as follows:

> On February 6, 2001, you made a chronological entry of an attempted field visit to
> Ronda Felix's residence at an address supplied by her on February 2. You
> documented that you could not confirm the residence and that the manager of the
> trailer court did not have anyone with the client's name listed at that address. There
> is no documentation of follow-up with the client regarding her correct address. This
> is a violation of policy 1.742, Residence Records, which requires an ongoing record
> of each client's residence and related information.

Id. Ex. 39; Ex. 6 at 89-90. Plaintiff believes that she did follow up and obtain Felix's correct address,

even if she did not document it.

> The second policy violation which Platt described was as follows:

> There is an attempted home visit on February 15, 2001, referred to in chronological
> records dated February 14 and February 16. However, there is no chronological entry
> for an attempted home visit on February 15. This is a violation of policy 1.712,
> Chronological Records which requires that all attempted community visits be
> recorded.

Id. Ex. 39 at 2. Plaintiff states that she was not required to make three home visits in one week and

does not think that if she made home visits on February 14 and 16, she would have also made a home

visit on February 15.

> Platt set out plaintiff's third policy violation as follows:

> On March 12, 2001, you spoke with Judge Waller seeking permission for Ronda Felix
> to transfer to Topeka for supervision. There is no documentation of why you did not
> discuss the case with the sentencing judge, Judge Friedel. This is a violation of policy
> 1.714, Courtesy Supervision, which requires that approval must be obtained from the
> sentencing judge before a transfer may occur.

Id. Ex. 39 at 2. Plaintiff is sure that she actually talked to Judge Friedel, and that the reference to

Judge Waller in her report was a typographical error.

Platt described plaintiff's fourth policy violation as follows:

On March 15, 2001, you received a call from LaJune Carson, whom Ronda Felix had lived with before transferring to Topeka. Ms. Carson informed you that Ronda Felix had stolen her clothing and forged her checks. She also informed you that she had filed a police report. There is no documentation that you obtained the police report, contacted the detective on the case, or did any further investigation of the allegations. This is a violation of policy 1.764, Violations, which requires that all violations that may be indicative of renewed criminal activity be investigated immediately and thoroughly and the findings reported to the appropriate supervisor. This policy also requires that copies of law enforcement reports be obtained and placed in the client file. You clearly dismissed what was potentially a serious violation of probation and directly related to the criminal history of Ronda Felix.

Id. Ex. 39 at 2-3. In response, plaintiff says that she did not give any credence to Carson's claims that Felix had stolen her clothes and forged her checks because (1) Carson was Felix's roommate, (2) Carson was an "admitted lesbian," (3) Carson called plaintiff even when Felix was not in town to tell her that Felix was "doing things," and (4) a federal probation officer had told plaintiff that Carson was a mental patient. Plaintiff admits, however, that she did not obtain a copy of Carson's police report. Id. Ex. 2 at 220-221. Further, Platt was not aware that the Shawnee County prosecutor had declined to prosecute Felix or that Nash did not recommend a pursuing a warrant.

Platt set out plaintiff's fifth policy violation as follows:

On March 22, 2001, you received a call from Rentaway Rent A Center informing you that Ronda Felix had left with their property. You informed the caller that the client's current location was "unknown and unavailable." There is no documentation that you made any attempts to investigate or follow-up on this allegation. This is a violation of policy 1.764, Violations, which requires that all violations that may be indicative of renewed criminal activity be investigated immediately and thoroughly and the findings reported to the appropriate supervisor. In failing to investigate this allegation, you established a pattern of ignoring possible felony offenses committed by Ms. Felix.

Id. Ex. 39 at 3.

16

Plaintiff responds that she did not investigate Rent A Center's allegation of theft because plaintiff had seen Felix as she left Wichita on a bus to Topeka and plaintiff knew that Felix had not taken any Rent A Center property with her.

Platt set out plaintiff's sixth policy violation as follows:

> On June 19, 2001, you received a call from the Intensive Supervision Officer supervising Ms. Felix in Topeka regarding allegations by Ms. Felix's employer, Attorney Henry Boaten, that she was forging checks from his business accounts. There is no documentation that you did any follow-up regarding these allegations after Ms. Felix returned to Wichita. In fact, you told me during our conversation on July 19 that you had just "started fresh" upon Ms. Felix's return. This is a violation of policy 1.764, Violations, that requires all violations that may be indicative of renewed criminal activity to be investigated immediately and thoroughly and the findings reported to the appropriate supervisor. You failed to investigate allegations of new criminal offenses that were very similar in nature to Ms. Felix's criminal history.

Id. Ex. 39 at 3. Plaintiff responds that: (1) the Shawnee County ISO should have investigated Boaten's allegations, (2) Boaten did not have any concrete information and (3) plaintiff shared Boaten's allegations with Nash and Judge Friedel. Plaintiff may have told Platt that she "started fresh" when Felix returned to Wichita because that is what she did.

Platt set out plaintiff's seventh policy violation as follows:

> On October 31, 2001, you received a call from the Intensive Supervision Officer in Topeka and received information that Ms. Felix had been untruthful about where she was employed on two separate occasions, had failed to attend mental health counseling, had failed to provide verification of community service work, and had failed to report to her Intensive Supervision Officer as directed. There is no documentation that you staffed this case with your supervisor or provided information to the Judge. In fact, you asked the Intensive Supervision Officer in Topeka to give Ms. Felix more time to get in compliance. This is a violation of policy 1.714, Courtesy Supervision, which requires that when the supervising agency notifies the Sedgwick County Intensive Supervision Officer of client violations, the case should be staffed with the supervisor and sanctions, including the possible return of the client to Sedgwick County, be imposed. It is also in violation of policy 1.764, Violations, that requires the sentencing judge be notified within two working days of

17

receiving information concerning consistent non-compliance to program conditions.

Id. In response, plaintiff states that she discussed with Nash the information about Felix's problems in Topeka. Plaintiff states that she and the Topeka ISO discussed the problems and agreed to give Felix until November 9, 2001 to comply with her conditions of probation. On November 7, 2001 plaintiff sent Judge Friedel an e-mail which informed him of the November 9 deadline.

According to Platt, plaintiff's eighth policy violation was as follows:

> On November 9, 2001, you received a call from the Intensive Supervision Officer in Topeka that reported Ms. Felix was still noncompliant and that there were allegations that she had impersonated an attorney and forged checks. Once again, there is no documentation of any follow-up on these allegations after Ms. Felix returned to Wichita, nor is there any documentation that you informed your supervisor or the judge. This is a violation of policy 1.764, Violations, which requires that all violations that may be indicative of renewed criminal activity be investigated thoroughly and reported to your supervisor.

Id. Ex. 39 at 3-4. Plaintiff responds that she prepared the warrant for Felix's arrest based on the information in the affidavit of the Shawnee County ISO.

Platt set out plaintiff's ninth policy violation as follows:

> After Ms. Felix returned to Wichita for supervision, you completed a Risk Need Assessment on March 25, 2002. Your errors in completing this assessment resulted in Ms. Felix being supervised at a level of supervision that was less intensive than it should have been. Specifically, you scored R5, Number of Prior Probation/Parole Episodes Terminated by Revocation, as 0 = None, when in fact Ms. Felix had a probation revocation where she was revoked and reinstated on 02-26-02. On item R10, Prior Adult Prison, Juvenile Correctional Facility, or Adult Jail Sentence, you scored Ms. Felix as having none, when in fact she had been to federal prison. You have received eight hours of formal training on this Risk Assessment tool (01-18-01 and 01-31-01). In addition, you have a desk reference manual on how to complete the assessment. Your failure to complete this assessment correctly is a violation of policy 1.744, Risk/Need Assessment & Level of Supervision, which requires that the assessment be completed as outlined in the Kansas Community Corrections and Court Services Offender Classification Procedure Manual issued on January 29, 2001.

Id. Ex. 39 at 4. Plaintiff admits that she erred in completing Felix's risk/needs assessment.

18

Platt described plaintiff's tenth policy violation as follows:

On May 13 and June 21, 2002, you documented that you were contacted by Stephanie Domingo of Wescot, Inc., with her concerns about Ms. Felix's poor work attendance and possible theft of an employee's checkbook.  According to Ms. Domingo, but undocumented in the case file, she also discussed with you her suspicion that Ms. Felix wasn't really pregnant and that Ms. Felix had failed to provide medical documentation of her need for continued sick leave after repeated requests.  There is no documentation of any efforts on your part to obtain medical documentation of the "problem pregnancy" reported by Ms. Felix.  This is a violation of policy 1.724, Employers Contacts, which requires the Intensive Supervision Officer to address any problems that may occur regarding the client's employment.

Id.  In response, plaintiff admits that she had the reported conversations with Domingo.  Plaintiff told Domingo that if she wanted to fire Felix, she should do so.  Plaintiff did not obtain any medical documentation that Felix was pregnant.

Platt set out plaintiff's eleventh policy violation as follows:

On May 14, 2002, you documented an attempted visit to Ms. Felix's home in which no one answered the door.  You further stated "She is supposed to be on medical restrictions."  However, there is no documentation in the case file that you obtained medical records describing these restrictions.  This is a violation of policy 1.747, Special Needs Clients, which requires that documentation of any limitations that may affect the supervision of the client be contained in the case file.

Id.

Platt described plaintiff's twelfth policy violation as follows:

On May 29, 2002, you documented that Ms. Felix was excused from community service work because she was close to her delivery date and having medical problems.  However, there is no documentation in the file regarding the reported medical problems. This is a violation of policy 1.713, Community Service Work, which requires that if a client is unable to complete community service work due to medical limitations, documentation supporting the limitations be maintained in the client case file.

Id.  Plaintiff responds that Judge Friedel removed Felix from community service and that he and Felix's attorney acknowledged Felix's pregnancy in the courtroom.

Platt set out the following paragraph under the category of general inadequate job performance:

> You repeatedly failed to provide accurate information to Annie Nash regarding Ms. Felix's progress on probation. During your individual meetings with Mrs. Nash, during which your caseload is discussed and problems identified, you always indicated that Ms. Felix was doing well and complying with the terms and conditions of her probation. These case review meetings with Mrs. Nash occurred on March 12, April 9, May 7, and June 27, 2002. Not once did you mention the numerous allegations of criminal activity or program violations.

Id. Ex. 39 at 5.  Plaintiff responds generally that she told Nash about information that she had on Felix.

In the pre-termination hearing notice memorandum, Platt stated that plaintiff's account of her conversation with Dr. Messamore's nurse was contrary to Dr. Messamore's account:

> Furthermore, on July 8, 2002, after being instructed by Annie Nash to contact Ms. Felix's physician to see if you could obtain information on when and where the baby was born, you reported back to Ms. Nash that you had contacted Dr. Messamore's nurse, Deborah, and been informed that Ms. Felix had a miscarriage early in her pregnancy.  Later, after Ms. Nash informed you that we had contacted the Wichita Police Department and would soon be speaking with the assigned detective, you told Ms. Nash that you did not think it would be necessary to talk with the police because Dr. Messamore had just informed you that Ms. Felix had not been pregnant at all.  On July 9, 2002, Annie Nash contacted Dr. Messamore to verify your phone call with her nurse "Deborah" on July 8.  Dr. Messamore informed her that her nurse, Megan, told you that Ms. Felix had been seen on June 4 for pain, and that you asked her if Ms. Felix had a miscarriage.  According to Dr. Messamore, Megan told you that Ms. Felix had not been pregnant and had reported having a hysterectomy several years earlier. The doctor further indicated that they always pull the patient file when providing information, so the nurse would not have gotten Ms. Felix mixed-up with another patient.  Dr. Messamore further indicated that she had returned a call to you after her nurse Megan told her about your call.  She indicated that she called back to verify who you were and where you worked.  She again told you that Ms. Felix had not been pregnant.  This is another example of your decision or desire to not investigate or follow-up on Ms. Felix's behavior, resulting in a serious threat to public safety.

Id.  Plaintiff responds that she spoke with "Deborah" at Dr. Messamore's office.  The person, who

plaintiff understood was Dr. Deborah Messamore, said that Felix has miscarried.

Platt concluded her pre-termination hearing notice as follows:

Your supervision of Ronda Felix demonstrates your continued failure to abide by department policy which requires you to obtain follow-up documentation of client activities and disclose detailed information to your supervisor and the judge. It also demonstrates your pattern of minimizing the seriousness of client violations. You have been trained on and warned about these policy violations on numerous occasions.

Id.

On August 29, 2002, Masterson (Corrections Department Director) conducted plaintiff's pre-termination hearing.[18]  Plaintiff was represented by her attorney, Paul McCausland.  Platt, Nash, Lucretia Taylor, the County EEOC Director, and Jennifer Magana, the County legal counsel, also attended.  Plaintiff and her attorney had the opportunity to speak and present evidence.  Later the same day, McCausland delivered documents for Masterson's consideration.

Masterson considered suspending plaintiff, putting her on disciplinary probation or moving her to a corrections worker position.  He rejected these alternatives, however, because he concluded that plaintiff could not enforce Corrections Department policies.  On August 30, 2002, Masterson issued plaintiff a Notice of Termination based on the following specific findings:

1. Sheila Officer is a trained and seasoned Intensive Supervision Officer.

2. Sheila knows the policies and procedures of the department and the expectations of supervisors. She has received proper supervision and instructions on necessary changes to correct her work performance, however, she has failed to perform her supervision duties at an acceptable level as evidenced in the Rhonda Felix case.

3. The procedural violations in the Rhonda Felix case are not unique, but represent

---

[18]    Masterson moved the pre-termination hearing from August 20 to August 29, 2002, because plaintiff's aunt died.

a pattern of deficiencies in job performance detailed in the personnel file in memos and evaluations for years, and most recently in the evaluation dated June 4, 2002.

4. Sheila Officer's failure to act in verifying information on several reports of possible new criminal activity consistent with Rhonda Felix's history not only harmed the client but jeopardized public safety.  For example, the entire fake pregnancy should have been uncovered far in advance of the current situation had Sheila bothered to obtain and read the psychological evaluation dated April 10, 2000 where it states Rhonda had a tubal ligation after having three children by age 23. The evaluation further documents her "compulsive embezzlement and credit card abuse" as part of her diagnosis leading to her imprisonment.

5. The policy and procedure violations contained in the Notice of Pre-termination Hearing are supported by the evidence and found to be true.

6. Sheila Officer's handling of the Rhonda Felix case is unacceptable and cause for termination.

7. The arguments presented at the hearing in behalf of and by Sheila Officer to explain and mitigate her unacceptable job performance are unfounded.  Those include the following: the violations are nitpicking, overstatement of the facts as a pretext for other reasons to fire her, it was only one case and not representative of her overall job performance, race, potential embarrassment to the department in the media over the Felix case, vindictive supervisors, retaliation for past grievance, etc.

Defendant's Memorandum In Support (Doc. #52) Ex. 42 at 2.  The termination notice informed plaintiff that she could contact Human Resources about her grievance rights, but she did not do so.[19]

Sedgwick County written policy prohibits any form of racial discrimination in employment decisions.   Of all ISOs in the Correction Department, 66 per cent were Caucasian, 29 per cent were African-American and five per cent were Hispanic.

---

[19]    Plaintiff admits that she made mistakes in handling the Felix case but she contends that they were not sufficiently serious to justify termination. Plaintiff asserts that she could not have uncovered the pregnancy because the file which she received on Felix did not include any reference to the psychological evaluation of April 10, 2000.  She admits that she did not request a release for Felix's health care provider, even though Department policy required documentation when an offender under supervision was off work due to a medical condition.

Other ISOs Terminated By Masterson

Since he became director of the Corrections Department in 1997, Masterson has terminated or held a pre-termination hearing for three ISOs besides plaintiff: King Dixon, Melissa Renner and Sandra Moser.[20]

King Dixon is African-American. Dixon's supervisor found that he had abused his position as ISO I to obtain confidential criminal history information regarding a non-probationer and then used that information to coerce a sexual relationship with that non-probationer. Dixon resigned on September 18, 1998, after the pre-termination hearing but before Masterson had decided whether to terminate his employment.

On April 25, 2000, Masterson terminated Renner, who is one-eighth Native American, for violating policy in supervising a specific probationer. Renner's most egregious violation was making false representations to a city prosecutor to secure dismissal of drug charges pending against a probationer. Masterson testified that he did not know that Renner was Native American. Plaintiff attempts to controvert this testimony by pointing out that Masterson and Platt reviewed Renner's file before she was terminated, but she does not assert that Renner's file contained information on Renner's race or ethnic background.

On May 9, 2005, after plaintiff's termination, Masterson terminated Moser, a Caucasian ISO I, for violating Department policies. These included requesting special favors from a judge and a prosecutor for a relative charged with crimes, administering a breath test on a non-probationer, taking

---

[20]     Before plaintiff's termination, Platt had recommended termination of two African-American employees and one Native American employee. Platt has recommended termination of only one Caucasian employee, Sandra Moser.

prescribed medications from a probationer and making false statements at her pre-termination hearing.

Defendant's Discipline of Steve Kalocinski

Steve Kalocinski, a Caucasian male, has worked for the Corrections Department for over 20 years. In September of 1999, he was working as an ISO III. On September 8, 1999, Platt recommended that Masterson demote Kalocinski because of unsatisfactory performance as a supervisor. Kalocinski agreed to a voluntary demotion to ISO I in the juvenile field services division. In November of 2001, Masterson placed Kalocinski on 90-day disciplinary probation because of unsatisfactory performance of his duties as an ISO. The unsatisfactory performance included three incidents: (1) on October 24, 2001, allowing a client to enter a secure building even though the client did not successfully pass through the metal detector; (2) on November 5, 2001, allowing a client to walk unescorted out of his sight in a secure building, thus allowing the client to walk by another client whom law enforcement was taking into custody; and (3) in November of 2001, failing to scan the parent of a client who was unable to pass through the metal detector successfully. Masterson believed that these actions posed a threat to public safety. Kalocinski did not satisfactorily complete his 90-day probation. In March of 2002, Masterson demoted Kalocinski to corrections worker and in May of 2005, Kalocinski was still working for Sedgwick County under Masterson's direction.

At some point, Kalocinski's supervisor verbally reprimanded him for keeping an aluminum baseball bat emblazoned with the word "compliance" under his desk. A year later, Kalocinski's supervisor gave him a written reprimand and recommended a one-day suspension without pay

because Kalocinski still had not removed the bat.[21]  Another time, Kalocinski was disciplined for loading and playing computer games on a Department computer.

Officer's Allegations Of Protected Conduct

In July of 1994, Officer submitted an "employee issues statement" which alleged that the Department engaged in unfair and biased promotion and employment practices.  At that time, Masterson was not employed in the Department.  Masterson testified that when he decided to terminate plaintiff's employment on August 30, 2002, he did not know about her statement in 1994.

In March of 1995, Dishawn Adams, an ISO, submitted an employee issues statement concerning denial of the registration fee to attend a conference of the National Association of Blacks in Criminal Justice in Dallas, Texas.  Since about 1997, the Department has allowed plaintiff and others to attend the conference.  When Adams submitted her issues statement, Masterson was employed in a different division of the Corrections Department.

On February 4, 1997, plaintiff wrote Platt a memo which stated that the percentage of African-American ISOs did not mirror the percentage of African-American probationers.  At that time, Masterson was employed in a different division of the Department, and he testified that he did not know about Officer's memo when he terminated her employment on August 30, 2002.[22]

_____

[21]    Plaintiff states that Kalocinski was also disciplined because he failed to supervise a shower room and a resident was assaulted and he improperly removed an arrest and detain order.  Plaintiff does not provide record evidence that this discipline actually occurred or the date on which it occurred.  Plaintiff cites Masterson's deposition as record support, but Masterson specifically testified that he was *not* aware of such incidents.  See Doc. #64 Ex. 1, Masterson Depo. at 100.

[22]    Plaintiff attempts to controvert Masterson's testimony that he was not aware of the 1997 memo by citing Masterson's purported testimony that he reviewed plaintiff's employment record before he terminated her employment.  Plaintiff does not provide a specific page citation to
(continued...)

Plaintiff alleges that in violation of Title VII and the KAAD, defendant terminated her employment because of race (Count I) and fired her in retaliation for engaging in protected conduct (Count III). Defendant asserts that it is entitled to summary judgment on plaintiff's discrimination claim because even if she can establish a prima facie case, the record contains no evidence that the stated reasons for termination were a pretext for race discrimination. Defendant asserts that it is entitled to summary judgment on plaintiff's retaliation claim because plaintiff has not established a prima facie case of retaliation. Specifically, defendant asserts that the record contains no evidence of protected opposition to discrimination or a causal connection between the protected activity and the adverse action.

**Analysis**

**I.    Race Discrimination (Count I)**

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Court applies a disparate treatment analysis to claims alleging that an employer treats some people less favorably than others because of their race, color, religion, sex or national origin. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977). To prevail on her

---

[22](...continued)
Masterson's deposition, however, and the Court has not found such a statement. Further, although the memo is in the record, the record does not reflect whether the memo was in plaintiff's employment file. In the Notice of Termination which Masterson issued plaintiff, he specifically found that "[t]he procedural violations in the Rhonda Felix case are not unique, but represent a pattern of deficiencies in job performance detailed in the personnel file in memos and evaluations for years, and most recently in the evaluation dated June 4, 2002.

disparate treatment claim under Title VII, plaintiff must show that the alleged discrimination was intentional.

Because she relies upon indirect evidence, plaintiff's claim of racial discrimination is subject to the familiar three-step McDonnell Douglas analytical framework. See Kendrick v. Penske Transp. Servs, Inc., 220 F.3d 1220, 1225-1226 (10th Cir. 2000) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Under McDonnell Douglas, plaintiff has the initial burden of showing a prima facie case of racial discrimination in her employment termination. Kendrick, 220 F.3d at 1226. Plaintiff satisfies this burden by presenting a scenario that on its face suggests that defendant more likely than not discriminated against her. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). As to each claim of disparate treatment, plaintiff may make a prima facie case by showing that "(1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination." Ammon v. Baron Auto. Group, 270 F. Supp.2d 1293, 1310 (D. Kan. 2003) (citing Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002)).[23] The burden of establishing a prima facie case of disparate treatment is not onerous. For purposes of summary judgment, defendant concedes that plaintiff has established a prima facie case. The burden thus shifts to defendant to articulate a legitimate, nondiscriminatory reason for the questioned action. See Nulf, 656 F.2d at 558.

Defendant asserts that it terminated plaintiff's employment because Masterson concluded that

---

[23] The Tenth Circuit has stated that in a termination case, plaintiff need only show that (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge. Kendrick, 220 F.3d at 1229.

in supervising Felix, she had violated numerous department policies.  Masterson also found that plaintiff had a history of inadequate job performance.  The Court finds that defendant has met its burden to articulate a facially nondiscriminatory reason for terminating plaintiff's employment.  See Kendrick, 220 F.3d at 1229-1230.

Under the third step of the McDonnell Douglas framework, the burden shifts back to plaintiff to show that defendant's stated reasons for her termination were merely a pretext to hide racial discrimination.  Id. at 1230; Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) (prima facie case and sufficient evidence to reject employer's explanation may permit a finding of liability) (ADEA case).  Defendant asserts that it is entitled to summary judgment because plaintiff has produced no evidence from which a jury could conclude that Masterson's real reason for terminating her employment was race.  The relevant issue is not whether the stated reasons for termination were wise, fair or correct but whether Masterson honestly believed in those reasons and acted in good faith.  Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004).  In examining this issue, a court must "look at the facts as they appear to the person making the decision to terminate plaintiff."  Kendrick, 220 F.3d at 1231.  The Court's role is not to second guess an employer's business judgment.  Stover, 382 F.3d at 1076.

Plaintiff' evidence of pretext  may take a variety of forms.  Kendrick, 220 F.3d at 1230.  A plaintiff typically makes a showing of pretext by showing that  defendant's stated reason is false, or that defendant acted contrary to company policy or practice when making the adverse employment decision.  A plaintiff who wishes to show that defendant acted contrary to an unwritten policy or practice often does so by providing evidence that it treated her differently from similarly-situated employees who violated work rules of comparable seriousness.  See Aramburu, 112 F.3d at 1404.

28

In a brief argument, plaintiff asserts that she has shown pretext in four ways. First, she asserts that defendant's stated reason for termination is false. She points out that the stated reasons include minor policy violations over a year and a half, during which she received satisfactory evaluations and pay raises.[24] From such evidence, a reasonable jury would not find that the stated reasons for termination were false. Plaintiff's evidence is, at most, only a scintilla of evidence that the stated reasons for termination are false.

Second, plaintiff suggests that she can show pretext based on the number of African-Americans which Masterson has fired since 1997. Although plaintiff cites no case law for this proposition, the Supreme Court has held that statistics may be used to prove that an employer's racially neutral reason for termination is pretext. See McDonnell Douglas, 411 U.S. at 804; Anderson v. City of Albuquerque, 690 F.2d 796, 802 (10th Cir. 1982). Plaintiff states that since 1997, Masterson and Platt fired three African-American ISOs and one Native American ISO. Actually, Masterson has terminated only three ISOs: Renner (who is one-eighth Native American), Moser (who is Caucasian) and plaintiff (who is African-American). Although Masterson held a pre-termination hearing for Dixon (who is African-American), Dixon resigned before Masterson's decision. The Department's racial composition for ISOs is 66 per cent Caucasian, 29 per cent African-American, and five per cent Hispanic. Plaintiff's evidence that Masterson has fired one Native American, one Caucasian and one African-American does not provide statistical evidence of pretext. See Kuhn v. Ball State Univ., 78 F.3d 330, 332 (7th Cir. 1996) (before court will infer discrimination, plaintiff must subject all of

---

[24]    Plaintiff also notes that the stated reasons include a  conclusion that plaintiff should have known that Felix was not pregnant, when she could not have known that Felix was faking her pregnancy. The termination notice, however, faulted plaintiff for not obtaining a medical release as required by policy.

employer decisions to statistical analysis to find out whether race made a difference).

Third, plaintiff asserts that defendant violated its progressive discipline policy when it terminated her employment instead of giving her a written reprimand, suspending her, placing her on disciplinary probation or demoting her.[25]  The progressive discipline policy, however, allows the decision-maker discretion to impose discipline ranging from verbal counseling through written reprimand, probation, suspension without pay, demotion and termination.  See Platt Deposition at 117-120.  Defendant responds that Masterson considered disciplinary alternatives but believed that plaintiff's conduct was too serious for anything but termination.  Plaintiff has not countered the fact that in supervising Felix, she violated *many* department policies.  The Court finds that plaintiff has not demonstrated a genuine issue of material fact whether Masterson violated Sedgwick County's written policy on progressive discipline.

Fourth, plaintiff asserts that Masterson acted contrary to unwritten policy or company practice when he terminated her employment but did not terminate the employment of a similarly situated Caucasian employee – Kalocinski – who violated work rules of similar seriousness.  Plaintiff contends that Kalocinski was similarly situated because he worked as ISO I for a time.  She points out that although Kalocinski violated Department policies on many occasions, Masterson disciplined him by demotions, probation and written reprimands rather than by terminating his employment.

An employee is similarly situated to plaintiff if the employee deals with the same supervisor

---

[25]    Plaintiff suggests that defendant used her as a scapegoat because Masterson was concerned that the Department would be held responsible for "letting a babynapper loose in the hospitals of Kansas."  Plaintiff's Response (Doc. #63) filed August 22, 2005, at 25.  This argument adds nothing to plaintiff's race discrimination claim; if anything, it suggests that defendant terminated her employment to avoid adverse publicity (a legitimate non-discriminatory reason) and not on account of her race.

and is subject to the "same standards governing performance evaluation and discipline." <u>Aramburu</u>, 112 F.3d at 1404. A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employee in determining whether they are similarly situated. <u>Id.</u>

Defendant asserts that Kalocinski was not similarly situated to plaintiff. First, defendant correctly points out that before September 1999 Kalocinski was an ISO III who supervised other employees, while plaintiff was an ISO I who never supervised other employees. Although Kalocinski was demoted to plaintiff's level in September of 1999, he worked in the juvenile field services division and had different supervisors than plaintiff. <u>See</u> <u>Aramburu</u>, 112 F.3d at 1404. Plaintiff counters that even though they had different supervisors, Masterson made the disciplinary decisions as to both. The Court agrees that a jury could reasonably find that Kalocinski and plaintiff were similarly situated from September of 1999 to March of 2002, when Kalocinski was demoted to corrections worker.

Defendant asserts, however, that Kalocinski did not violate work rules of similar seriousness to plaintiff. Kalocinski's violations as an ISO I included (1) allowing a client to enter a secure building even though the client did not successfully pass through the metal detector; (2) allowing a client to walk unescorted out of his sight in a secure building, thus allowing the client to walk by another client whom law enforcement was taking into custody; and (3) failing to scan the parent of a client who was unable to pass through the metal detector successfully. All of these violations presented potential threats to public safety.[26] Even if Kalocinski's three public safety violations

---

[26]    Kalocinski's supervisor also reprimanded Kalocinski on two occasions for keeping
(continued...)

31

could be viewed as comparable to some of plaintiff's violations, his violations were apparently isolated and non-consequential.  Plaintiff, in contrast, violated *many* work rules which affected public safety.  Her much-counseled comprehensive failure to follow department policy led to far more serious results in the Felix case.  The Felix case was not an isolated incident of poor performance. In the two years before plaintiff's termination, her supervisor issued several written warnings concerning deficient job performance.  These deficiencies included failure to adequately supervise probationers, failure to document her supervision of probationers, failure to follow procedures for urine testing and failure to inform judges of probationers' violations in a timely manner.  Nash repeatedly told plaintiff that she needed to obtain follow-up documentation of client activities and disclose detailed information to Nash and judges.  Nash repeatedly warned plaintiff to stop minimizing the seriousness of client violations.  Plaintiff's failure to heed these warnings led to the potentially disastrous results in the Felix case and to defendant's decision to terminate plaintiff. Plaintiff has not demonstrated a genuine issue of material fact whether Kalocinski's violations were of similar seriousness to her own.  Defendant is therefore entitled to summary judgment on plaintiff's disparate treatment claim that it merely disciplined and demoted, rather than fired, a Caucasian employee who violated work rules of similar seriousness to plaintiff.

## II.     Retaliation Claim (Count III)

Plaintiff alleges that defendant fired her in retaliation for her 1994 employee issues statement

---

[26](...continued)
under his desk an aluminum baseball bat emblazoned with the word "compliance."  Kalocinski's failure to remove the bat after the first request is not a violation of similar seriousness to plaintiff's.

and her 1997 memo advocating the employment of more African-American ISOs.[27]  Defendant asserts that plaintiff cannot establish a prima facie case of retaliation.

To establish a prima facie case of retaliation for engaging in activity protected under Title VII, plaintiff must show (1) that she engaged in protected opposition to discrimination; (2) that she suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action.  O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1258 (10th Cir. 2001).

To establish that she engaged in protected activity under Title VII, plaintiff must show that she participated in a Title VII investigation or opposed Title VII violations.  42 U.S.C. § 2000e-3(a). Defendant concedes that the 1994 employee issues statement satisfies the "protected opposition" element of a prima facie case.  Defendant correctly asserts that the 1997 memo to Platt does not constitute "protected opposition" because plaintiff was not opposing a practice "made an unlawful employment practice" by Title VII.  42 U.S.C. § 2000e-3(a).  In the memo, plaintiff advocated more African-American ISOs because of what she perceived as a high percentage of African-American probationers.  She did not allege any unlawful employment practice.  See Petersen, 301 F.3d at 1187-88.

Assuming that plaintiff has satisfied the "protect opposition" element of a prima facie case, defendant asserts that plaintiff cannot establish a causal connection between the protected activity and her termination.  Plaintiff can establish the causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse

---

[27]     Plaintiff cannot rely upon protected opposition by Adams for her own retaliation claim.  See Petersen v. Utah Dep't of Corrs., 301 F.3d 1182, 1187-88 (10th Cir. 2002).

action." Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982).

Defendant points out that Masterson testified that when he terminated plaintiff's employment on August 30, 2002, he was not aware of her 1994 statement and 1997 memo. See Petersen, 301 F.3d at 1188-89; Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1184 (10th Cir. 2002) (for causation, person making termination decision must have knowledge of employee's protected activities). Plaintiff suggests that the documents were in her personnel file and that Masterson reviewed her file before he made the termination decision. As set out above, however, plaintiff has not cited evidence that the documents were in her personnel file. Plaintiff has not cited evidence from which a reasonable jury could conclude that Masterson knew of plaintiff's protected opposition.

Alternatively, defendant argues that the sheer length of time eliminates any possible inference that plaintiff's termination resulted from her protected activity. The Tenth Circuit has held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999). Hysten, 296 F.3d at 1183-84; Kendrick, 220 F.3d at 1234. On the other hand, the Tenth Circuit has held that a three-month period, standing alone, is insufficient. See Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)). Plaintiff's most recent alleged protected activity, i.e. her 1997 memo, preceded her termination by more than five years. No inference of causation or retaliatory animus can be drawn from such a lengthy period. Id. Therefore plaintiff cannot establish the causal connection required for a prima facie case of retaliation.

Alternatively, even if plaintiff could establish a prima facie case of retaliation, the burden would shift to defendant to articulate a nondiscriminatory reason for the adverse employment action. If the employer satisfies this burden of production, plaintiff must prove that the employer's

34

articulated reason for the adverse action is pretextual, i.e. unworthy of belief.  Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1264 (10th Cir. 2001).  As set forth above, plaintiff has not shown a genuine issue of material fact whether Masterson's stated reasons for termination were unworthy of belief.  Defendant is entitled to summary judgment on plaintiff's retaliation claim.

IT IS THEREFORE ORDERED that Sedgwick County's Motion For Summary Judgment (Doc. #51) filed July 5, 2005 be and hereby is SUSTAINED.  The Clerk is directed to enter judgment for defendant.

Dated this 4th day of October, 2005 at Kansas City, Kansas.

s/Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge